Strafford
No. 2002-785

THE STATE OF NEW HAMPSHIRE

v.

CIRO SCOGNAMIGLIO

Argued: January 15, 2004
Opinion Issued: February 13, 2004

*Peter W. Heed,* attorney general (*Simon R. Brown,* assistant attorney general, on the brief and orally), for the State.

*Dawnangela Minton,* assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Ciro Scognamiglio, was convicted after a jury trial in Superior Court (*Fauver,* J.) of second-degree assault for recklessly causing serious bodily injury to Nancy Williams. *See* RSA 631:2, I(a) (1996). On appeal, he contends that: (1) there was insufficient evidence that he caused serious bodily injury to Williams; (2) the prosecutor made improper statements during closing argument warranting a mistrial; and (3) the trial court erred when it imposed an extended term of imprisonment. We affirm in part, vacate in part and remand for resentencing.

The jury could have found the following facts. In March 2001, the defendant became acquainted with Nancy Williams, who lived in the same apartment building. Shortly thereafter, they developed a romantic relationship, which Williams described as "on again/off again." On August 24, 2001, the defendant called Williams and told her he was coming over to her apartment. Williams told the defendant not to come over and that she wanted to end the relationship. The defendant insisted on coming to Williams' apartment because he did not want to discuss their relationship over the phone.

At approximately 12:15 a.m., the defendant arrived at Williams' apartment where they continued to discuss their relationship. Williams repeatedly told the defendant that she wanted to end the relationship.

Williams eventually told the defendant that she was going to bed and that he should let himself out. The defendant followed Williams as she began walking toward her bedroom. Williams turned around, faced the defendant, put her hands on his chest and told him to leave. The defendant grabbed Williams' arms and slammed his head into her nose. Subsequently, Williams called the police and the defendant was indicted for second-degree assault for "recklessly caus[ing] serious bodily injury to another." *Id.*

On appeal, the defendant first argues that there was insufficient evidence to prove serious bodily injury, as opposed to bodily injury. "Serious bodily injury" is defined as "any harm to the body which causes severe, permanent or protracted loss of or impairment to the health or of the function of any part of the body." RSA 625:11, VI (1996). Whether Williams' injuries constituted "serious bodily injury" is a question of fact for the jury to decide. *See State v. Plaut*, 124 N.H. 813, 813 (1984). "In ruling on the sufficiency of the evidence, we must decide whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found this element of the crime beyond a reasonable doubt." *State v. Kiluk*, 120 N.H. 1, 4 (1980).

The following evidence of serious bodily injury was presented at trial. After the defendant slammed his head into Williams' nose, she immediately felt pain, became dazed and had difficulty breathing. Blood poured from her nose. Williams sustained a cut on the bridge of her nose and a bump on its left side. Her eyes turned black and blue and swelled shut. The swelling continued for almost two weeks, and the discoloration of her eyes lasted for three weeks.

Approximately one month after the injury, Williams sought medical attention because the breathing passage on the right side of her nose was clogged, her nose was constantly running and she was in constant pain. Her treating physician observed that her nose was swollen on the left side and was somewhat deviated to the left. A CAT scan revealed a minimally displaced fracture along the bridge, as well as a build-up of fluid in the sinus of the left cheek, which had become infected resulting in sinusitis. Because the fluid was only on one side and on the same side that the nose was displaced, her doctor opined that the fluid was "most likely blood because of the trauma to the nose." The doctor testified that, if left untreated, the infection could develop into life-threatening conditions such as blood poisoning or meningitis. The doctor further testified that chances were "very, very great" that when the fracture healed, there would be new bone formation that would narrow the nasal passage of Williams' nose. At the time of trial, over one year later, Williams could still feel a bump on her

nose, continued to have an unusually runny nose and was still having trouble breathing.

■ This evidence, viewed in the light most favorable to the prosecution, supports the verdict. A broken nose, swollen discolored eyes, clogged breathing passages and a sinus infection constitute severe impairment to the health or function of the body. *See Kiluk*, 120 N.H. at 4 (holding that "[a] wound requiring sutures and a scratched eyeball resulting in blurred vision certainly qualif[ied] as serious bodily injury"); *State v. MacArthur*, 138 N.H. 597, 600 (1994) (finding serious bodily injury where the victim had several facial lacerations, a hemorrhage in her right eye and a swollen and bruised face). Accordingly, a rational trier of fact could have found beyond a reasonable doubt that Williams had suffered "serious bodily injury." *See Kiluk*, 120 N.H. at 4.

The defendant next argues that the trial court erred by not granting a mistrial because of improper statements made by the prosecutor during closing argument. "A trial court's denial of a mistrial will not be overturned absent an [unsustainable exercise] of discretion, due to the trial court's unique ability to gauge the reaction of the jury to any potentially prejudicial information." *State v. Giordano*, 138 N.H. 90, 94 (1993); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

■ "An improper comment made by the State during closing argument may, under certain circumstances, constitute prosecutorial overreaching requiring a new trial." *State v. Bujnowski*, 130 N.H. 1, 4 (1987). "In examining claims of prosecutorial misconduct during closing argument, we face the delicate task of balancing a prosecutor's broad license to fashion argument with the need to ensure that a defendant's rights are not compromised in the process." *State v. Boetti*, 142 N.H. 255, 260 (1997). Prosecutorial overreaching occurs when the government, "through gross negligence or intentional misconduct, caused aggravated circumstances to develop which seriously prejudiced a defendant, causing the defendant reasonably to conclude that continuation of the tainted proceeding would result in his conviction." *Bujnowski*, 130 N.H. at 4 (quotation and brackets omitted).

In *Bujnowski*, we held that there was prosecutorial overreaching when, in his closing argument, the prosecutor repeatedly stated his personal opinion about the veracity of witness testimony and continued to assert his opinion as to the credibility of witnesses and the guilt of the accused after the trial court admonished him for doing so. *Id.* at 3-5. In *State v. Dowdle*, 148 N.H. 345 (2002), we also held that there was prosecutorial

overreaching when, in closing argument, the prosecutor stated that defense counsel's job is to "fabricate something or tell [the jury] something that they just recently came up with." *Dowdle*, 148 N.H. at 346. The prosecutor further stated that:

> [Defense counsel's] job is to get their client off. [The jury's] job is to find the truth. [The State's] job is to present to you all the evidence, present the truth to you. [Defense counsel's] job is to obscure the truth if it hurts their client, to distract you from the truth.

*Id.* at 346-47.

Here, during closing argument defense counsel stated: "[L]awyers can bicker over everything—anything pretty much forever. It's what we're trained to do; it's what we're paid to do." In response, the prosecutor later stated: "There is a lot of talk about what lawyers do. They're hired to bicker. They're paid to bicker; they're paid to argue. The State is here to do one thing, ladies and gentlemen. To seek justice." Defense counsel objected, arguing that in making these statements and displaying a piece of paper containing the words "guilty" and "justice," the prosecutor was "vouching for his case" and impugning the integrity of defense counsel. The trial court overruled the objection and denied defense counsel's request for mistrial.

■ "Improper argument, while objectionable in any case, is especially troublesome when made by a prosecutor . . . ." *Boetti*, 142 N.H. at 260. The prosecutor, however, "is granted great latitude in closing argument, both to summarize and discuss the evidence presented to the jury and to urge the jury to draw inferences of guilt from the evidence." *State v. Grote*, 127 N.H. 748, 751 (1986). Here, the prosecutor's closing argument "does not reveal that he stepped over the boundary of permissible advocacy." *Id.* at 751. Unlike *Bujnowski* and *Dowdle*, the prosecutor did not expressly state his opinion, repeat questionable conduct or directly demean defense counsel. Moreover, his statement that lawyers are paid to bicker and argue was a restatement of what defense counsel said in his closing argument. While we discourage prosecutors from equating "justice" with a "guilty" verdict, on the particular facts presented here, the prosecutor's argument was not improper and thus did not constitute prosecutorial misconduct. Because we find that there was no prosecutorial misconduct, the trial court did not err in denying the defendant's motion for a mistrial.

■ Finally, the defendant argues that the trial court erred when it imposed an extended term of imprisonment. Specifically, the defendant

contends that the State failed to meet its burden of proving two previous periods of imprisonment on sentences in excess of one year. The State must establish the sentences and periods of imprisonment by a preponderance of the evidence, not beyond a reasonable doubt. *Cf. State v. LeBaron*, 148 N.H. 226, 232 (2002) (holding that prior convictions need not be proven beyond a reasonable doubt).

██ Under the sentencing statute then in effect, the trial court could impose an extended term of imprisonment if it found that the defendant "[h]as twice previously been imprisoned, in this state or in any other jurisdiction, on sentences in excess of one year." RSA 651:6, I(c) (1996) (amended 2003). In applying the statute, the trial court must make two findings: (1) two prior imprisonments, resulting from, (2) sentences in excess of one year. *State v. Kiewert*, 135 N.H. 338, 349 (1992). In addition, "the 'sentence' which governs for purposes of applying the statute is the maximum term." *Id.* at 348.

At sentencing, the State introduced certified copies of records from the State of Connecticut as proof of the defendant's two prior periods of imprisonment on sentences in excess of one year. Based upon this evidence, the trial court imposed an enhanced sentence of six to twenty years in State prison.

To establish the first period of imprisonment on a sentence in excess of one year, the State offered several documents relating to the defendant's murder conviction. One document was a certified copy of a conviction from the State of Connecticut Superior Court. The document indicated that the defendant was convicted of felony murder on March 1, 1983, and was sentenced to twenty-five years in prison. Another document was the mittimus for the murder conviction, which showed a disposition date of April 15, 1983, and a "total effective sentence" of twenty-five years. The mittimus also contained the signature of a Sheriff's Office representative, which indicated that the defendant was delivered to Somers Correctional Facility to serve the sentence.

██ The certified conviction and the mittimus clearly established that the defendant was sentenced to twenty-five years on the murder conviction. In addition, the mittimus established that the defendant was taken to the correctional facility to serve the imposed sentence. Accordingly, the evidence supported the finding that the defendant had been previously imprisoned on a sentence in excess of one year.

In order to establish the second period of imprisonment, the State offered a certified copy of a criminal record from the Connecticut State Police. The criminal record contained an entry for a burglary charge with

an "offense occurrence date" of July 12, 1992, and a "verdict date" of October 27, 1993. The record also contained the following information: "10YR JAIL, 3 YR TO SERVE, CONCUR, 5 YR PROB."

■ This evidence, while suggestive of imprisonment, is insufficient to support a finding that the defendant was imprisoned on a sentence in excess of one year for the burglary charge. Unlike the mittimus for the murder charge, there is no evidence that the defendant was taken to a correctional facility. Because it does not establish that the defendant was in fact imprisoned on that sentence, the State did not meet its burden to prove two prior periods of imprisonment on sentences in excess of one year by a preponderance of the evidence. We thus vacate the trial court's imposition of the extended term of imprisonment and remand for resentencing.

*Affirmed in part; vacated in part; and remanded for resentencing.*

NADEAU and DALIANIS, JJ., concurred.